UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 22-cr-259-TNM |
| LUKE LINTS, | |
| Defendant. | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Luke Lints respectfully submits this Memorandum in Aid of Sentencing.  Mr. Lints has pled guilty to one count of civil disorder, in violation of 18 U.S.C. §231(a)(3), for his role in the events at the United States Capitol on January 6, 2021.

Luke Lints is a young man – 26 years old on January 6, 2021 – from Traverse City, Michigan.  He is a gentle and non-violent person.  He did not go to Washington, DC, on January 6, 2021, intending to interfere in any way with the events occurring that day in connection with the 2020 election.  However, when he learned that his mother – who has a history of mental illness – was planning to travel on a church bus to attend the White House rally that day, and when he was offered a free ticket on the bus, Luke decided to accompany her.

They attended the rally at the Ellipse, and when they heard people say the Capitol was being attacked, Luke and his mother made their way there.  When they arrived, he said, it "looked like a bomb went off."  When Luke witnessed the violence occurring there, he tried to prevent it, and in doing so, he interfered with Capitol Police officers.  But he did so not with the goal of overwhelming the officers and obtaining access to the building, or assisting others in doing so, but to prevent injuries to others.  In fact, when he saw members of the crowd threatening to injure a police officer, he attempted to stop that as well.

Luke takes full responsibility for his acts, and recognizes that punishment is appropriate. He respectfully requests that in fashioning his sentence, the Court consider that his actions on January 6, 2021, did not spring from any desire to interfere with government functions in any way. Instead, he tried to do what he thought, at the time, was necessary to protect others who were there that day, on both sides of the conflict.

For the reasons stated below, Luke Lints respectfully suggests that a sentence of probation, with a significant community service component, is "sufficient, but not greater than necessary" to fulfill the purposes of sentencing.

## II.

## FACTS

### A. Luke Lints' History and Characteristics

Luke Lints was born in Traverse City, Michigan, on November 15, 1994, the first of three children born to Keith Lints and Andrea Ranney. He was raised in "low-income conditions." Presentence Investigation Report (May 19, 2023) [ECF No. 56] ¶ 70. The family was unstable, and both parents struggled with substance abuse. Luke frequently saw his mother – who suffered from mental illness – physically abuse his father. *Id.*

When Luke was about eight years old, a neighbor began to molest him. *Id.* ¶ 71. Luke also learned that the neighbor's son was abusing Luke's sister, Tabitha. Luke told his father about Tabitha, and his father called the police, which put an end to the abuse suffered by both Luke and Tabitha. However, Luke was deeply ashamed of what had happened, and did not tell anyone about his own abuse until he was 18.

When Luke was in first or second grade, his mother pushed him to the floor, angering Luke's father, who struck his mother. *Id.* ¶ 70. His parents separated after this incident, and Luke's life became even more chaotic. His mother's mental illness, and frequent psychiatric

hospitalization, made it impossible for Luke and his siblings to live with her.  On Luke's 13th birthday, Luke's father was evicted from the trailer in which Luke and his siblings were living with him.  *Id*. ¶ 72.  Luke's father was at work, and Luke and his siblings had to empty and vacate the home.  Luke lived with his father and siblings in a tent for several months, but when authorities discovered that this was occurring in November (when the average temperature in Traverse City ranges between 30-45 degrees Fahrenheit), the police were summoned, and Luke went to foster care.  He returned to live with his mother, but within a year, his mother's abuse had grown so unpalatable that Luke left home and entered a shelter program run by Goodwill.  From then until his graduation from high school in 2013, Luke lived at the shelter, in foster care, or with teachers, ministers and members of his church.  *Id.* ¶ 73.  Luke suffered from depression as a child and through high school.  He was placed in "special education" classes, and was frequently bullied.

Despite his tragic childhood, Luke has grown into a young man whom friends and neighbors describe as "good, caring, and gentle," and "eager to advance his place in the world,"  Exh. A hereto, "even keeled" and "quick to help in any way he can," Exh. B hereto, a "caring person," who – despite his upbringing – "honors his parents and treats them with love and respect," Exh. C hereto, "always looking for ways to help and people to love," Exh. D hereto, "very compassionate," Exh. E hereto, someone who "has a good heart, [and] cares," Exh. F hereto, and  "as gentle a soul as anyone makes them."  Exh. G hereto.

Those who know him say they have "never seen him act or speak in an aggressive way towards another person," Exh. A, and have "never seen him angry or have known him to be in trouble in any way."  Exh. B.  His father reports that as a teenager, when another student assaulted him and broke his glasses, he did not retaliate.  Exh. H hereto. Not surprisingly, given his upbringing, people who know Luke describe him as "a friend to the underdog,"  Exh.

3

C, and someone who "tends to stick up for the under dogs of life and is very merciful and kind to everyone he meets." Exh. E.  His good friend Mitchell Lewis describes him as someone whose "whole mission and goal is to love [and] protect" others, and states that Luke "regularly protected me from bullies and harassment in high school." Exh. G.  Mr. Lewis says, "the only way I have ever seen him act aggressively is in the protection of people who couldn't help themselves." *Id.*

Luke's mother, Andrea Ranney, states that he "knows right from wrong," Exh. I, but Luke's gentle nature and protective instincts have made him "impressionable" and someone whom "other people take advantage of." Exh. D.  Ronald Hale reports that some "use him for his time and money," and that "if he does not receive the care he needs and is surrounded by the wrong people he will be led on a path that is not good for him." Exh. J.

B.  **The Nature and Circumstances of the Offense**

Luke did not plan to go to Washington, DC on January 6, 2021, but when his mother told him she planned to go, and that he could ride the bus for free, he decided to accompany her.  The bus left Traverse City on the evening of January 5, 2021, and drove all night, arriving in D.C. shortly before the rally at the Ellipse.  Luke and his mother attended the rally, and when they heard people say the Capitol was being attacked, they made their way there.  When they arrived, they saw a huge crowd on the grounds, and Luke saw smoke rising from it.  He moved forward to get a better view, and became separated from his mother.  Luke learned later that she had become ill, and was taken to a hospital.

The events of January 6, 2021, were violent – several people lost their lives, and dozens were injured.  Much of the worst violence occurred in and near the lower West Terrace Tunnel, where Luke found himself.   Shocked by the violence he saw around him, Luke's protective instincts took over.   As he approached the tunnel, he saw Capitol Police Officer

4

Michael Fannone being dragged from the lower West Terrace Tunnel into the crowd and assaulted. Officer Fannone has testified that he feared for his life, and appealed to the crowd's "humanity," shouting "I've got kids." *See* https://www.youtube.com/watch?v=cJGe4C3QqNQ (time code 9:30). He went on to testify:

> Thankfully, some in the crowd stepped in and assisted me. Those few individuals protected me from a crowd and inched me toward the Capitol until my fellow officers could rescue me.

*Id*. (time code 9:40). Luke was among that group that protected Officer Fannone – as the crowd dragged Officer Fannone from the tunnel and began to attack him, Luke can be seen shouting at the crowd to stop. *See* https://www.youtube.com/watch?v=6msRoT_EHJQ, Exh. K hereto, (time code 1:30).

The West Terrace was the site of some of the most frenzied fighting to occur on January 6, 2021. *See* Holmes Lybrand and Hannah Rabinowitz, *New January 6 video shows three hours of violent and chaotic assault on police,* CNN (Dec. 24, 2021), available at https://www.cnn.com/2021/12/24/politics/january-6-video-capitol-hill-riot/index.html. Rioters brandished poles, fire extinguishers, and even crutches. *Id.* One Capitol Police Officer was pinned in a doorway "as he howled in pain." Kyle Cheney, *"Like an animal: Jan. 6 defendant who pinned officer in tunnel is sentenced to 7.5 years,* Politico (Apr. 14, 2023), available at https://www.politico.com/news/2023/04/14/january-6-defendant-sentenced-00092117. One member of the crowd died, steps from Luke Lints.

Luke was shocked by the "war zone" he saw in the tunnel. "People were getting hurt," he said, "and that's wrong." *See J6 Exposed* (Twitter Space podcast), available at https://twitter.com/i/spaces/1YpKkgoMAoBKj?s=20 (time stamp 1:58:47). He grabbed a riot shield and joined a group that was preventing officers in the tunnel from advancing. And

at one point, he prevented an officer from closing a door when he saw members of the crowd stuck behind the door.

But Luke did not interfere with the officers in an effort to assist those members of the crowd who sought to overwhelm the officers and take over the building.  Instead, he acted from an instinctive desire to protect people, as can clearly be seen in his effort to protect Officer Fannone.  "The only reason why I got involved," he would later say, "was because I felt like people were going to get hurt more if someone didn't do something."  *Id.*  (time stamp 1:59:25).  After a few moments in the tunnel, Luke was pepper-sprayed, and left the Capitol.

## II.

## ARGUMENT

The starting point of any federal sentencing proceeding is calculating the applicable Guidelines range, which serves as the "initial benchmark" in determining an appropriate sentence.  *United States v. Abukhatallah*, 41 F.4th 608, 643 (D.C. Cir. 2022).  However, the Guidelines are not mandatory, and the Court "may not presume that the Guidelines range is reasonable," but  "must make an individualized assessment based on the facts presented."  *Id.*  at 644.  Ultimately, the Court must impose a sentence "sufficient, but not greater than necessary," to comply with the following purposes:

- (A) to reflect the seriousness of the crime, to promote respect for the law, and to provide just punishment for the offense;

- (B) to afford adequate deterrence to criminal conduct;

- (C) to protect the public from further crimes of the defendant; and

- (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a).   Mr. Lints respectfully submits that here, that sentence is a term of probation, with a significant community service component.

A. **Application of the United States Sentencing Guidelines**

As indicated in the Plea Agreement, Mr. Lints and the government have agreed that the appropriate Guidelines Offense Level here is 11, and that his Criminal History category is I, which results in a recommended Guideline range of 8-14 months' incarceration. However, Mr. Lints respectfully submits that a variance is appropriate here in order to fulfill the purposes of sentencing.

B. **A Sentence of Probation and Community Service is "Sufficient, but not Greater than Necessary" to Effect the Purposes of Sentencing.**

As the government has said, in fashioning an appropriate sentence for a January 6 defendant, the defendant's individual conduct must be assessed "on a spectrum." Government's Sentencing Memorandum, *United States v. Pert,* No. 21-cr-139-TNM (D.D.C. 12/13/21) [ECF No. 49] at 10. In determining a fair and just sentence on this spectrum, the Court "should look to a number of critical factors," including:

(1) whether, when, and how the defendant entered the Capitol building;

(2) whether the defendant encouraged violence;

(3) whether the defendant encouraged property destruction;

(4) the defendant's reaction to acts of violence or destruction;

(5) whether during or after the riot, the defendant destroyed evidence;

(6) the length of the defendant's time inside of the building, and exactly where the defendant traveled;

(7) the defendant's statements in person or on social media;

(8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and

(9) whether the defendant demonstrated sincere remorse or contrition.

*Id.*  Application of these factors in this case places Luke Lints' conduct at a point on that spectrum that calls for a sentence of probation.

With respect to factor 1, Luke did not come to D.C. on January 6, 2021, to interfere with Congress or to engage in violence.  Rather, he came to D.C. to accompany his mother to the rally being held at the Ellipse.  He did not plan to go to the Capitol that day, but went there only after he heard that the Capitol was being attacked.  Luke was shocked by the violence he saw there,  and  entered the grounds out of concern for the people – including protesters *and* police – getting hurt there.  *See J6 Exposed* (Twitter Space podcast), available at https://twitter.com/i/spaces/1YpKkgoMAoBKj?s=20 (time stamp 1:57:50).

With respect to factors 2, 3 and 4, Luke did not encourage violence or property destruction.  In fact, he did the opposite.  As described above, Luke attempted to stop the assault of Capitol Police Officer Fannone.  And although he interfered with police, he did not do so in an effort to overcome police defenses and enter the building or otherwise interfere with official business.  Rather, he did so in an effort to protect others, and his actions were purely defensive.  *Id.* (time stamp 1:58:20).

With respect to factor 5, there is no evidence that Luke destroyed evidence to impede investigation, and when he was interviewed by FBI agents several weeks after January 6, 2021, he freely admitted to his conduct on that day.

With respect to factor 6, Luke never entered the Capitol.  He was in a location where some of the worst fighting of the day occurred, but he did not go there in order to participate in that fighting but, instead, to attempt to minimize that violence.

Luke did not make any statements about the events of  January 6, 2021, prior to that day, because he had no plans to take part in them.  Since that day, he has made several

online posts about that day. But in none of these posts has he attempted to justify the events of January 6, 2021, or to disavow responsibility for this actions.

Finally, Luke sincerely and deeply regrets the events of January 6, 2021, and his role in them. He recognizes that he must pay a price for them. He respectfully suggests that that price take the form of a significant community service requirement as a condition of probation.

1. **A Sentence of Probation Would Reflect the Seriousness of The Crime, Promote Respect for the Law, and Provide Just Punishment for the Offense.**

Luke Lints did not plan to be at the Capitol on January 6, 2021, and certainly would not do so today. He regrets his actions that day. He recognizes that his presence in the Capitol was improper, and that he contributed to the destructive turmoil that occurred that day.

In crafting a sentence that reflects the seriousness of his actions, promotes respect for the law, and provides just punishment for his offense, the Court should bear in mind that his acts were not premeditated. He did not come to Washington that day with any plan engage in violence or to go to the Capitol. Moreover, his actions at the Capitol are explained not by any desire to interfere with Congress, but instead, by a deep-seated desire to protect people.

Luke recognizes that a sentence of probation would fall at the low end of sentences imposed to date in cases where defendants have pled guilty to a violation of 18 U.S.C. §231(a)(3). But a sentence of probation is not unprecedented – in fact, this Court has imposed a sentence of probation on an individual convicted under §231(a)(3) on facts similar to those in this case. Eric Gerwatowski came to the Capitol on January 6, 2021, because he believed the election had been stolen, and "the commies are trying to steal the country." Government's Sentencing Memorandum, *United States v. Gerwatowski,* No. 22-cr-125-JMC (2/16/23) [ECF NO. 29] at 6. In "plain sight" of police officers, Mr. Gerwatowski "pulled open

9

Case 1:22-cr-00259-TNM   Document 60   Filed 05/19/23   Page 10 of 14

one of the doors the Capitol Police had just closed . . . [,] turned to the crowd and yelled 'Let's Go!' and directed more rioters inside the Capitol." *Id.* at 3-4; *see also Trump supporters, Capitol Building in DC, woman shot and killed* (YouTube video) (time stamp 10:40), available at https://www.youtube.com/watch?v=DryUBiO8yL0.  According to the government, "Gerwatowski's actions directly led to over a dozen rioters enter[ing] the building." *Id.* at 4. On those facts, the government recommended 3 months' incarceration, but the Court imposed a sentence of 24 months' probation.

It is true that there is no indication that Mr. Gerwatowski impeded officers with a riot shield, as Luke Lints did.  But a comparison of their demeanors in interfering with police officers' attempts to control doorways makes clear that their motivations were very different. Mr. Gerwatowski clearly sought to enable rioters to advance into the Capitol, while Luke sought only to prevent injuries.

Even if the Court were not inclined in impose a non-incarceratory sentence, any term of incarceration should be minimal.  In *United States v. Griswold,* No. 21-cr-459-CRC, the *defendant* "enthusiastically participated in the January 6, 2021 attack on the United States Capitol, … push[ing] his way into the Capitol, past police trying to guard the Rotunda Doors, and then through the building, thrusting his hands in the air and yelling in triumph." Government's Sentencing Memorandum, *United States v. Griswold,* No. 21-cr-459-CRC (D.D.C.  July 6, 2022) [ECF No. 52]  He entered the Senate Gallery, yelling, "this is our house now," and later gave an interview  "gloat[ing] that Members of Congress "ran and hid" while "we took the building," and threatened, "we will fucking do it again." *Id.*  Later, he deleted evidence from his phone, and "continue[d] to minimize and excuse his conduct" through sentencing.  *Id.*  On those facts, the government recommended 5 months' incarceration, and the Court imposed a sentence of 75 days' incarceration.

10

> In *United States v. Daryl and Daniel Johnson,* No. 21-cr-407-DLF, a father and son:
>
> [C]limbed through a smashed-out window near the Senate Wing Door to unlawfully enter the U.S. Capitol building, where [they] remained for approximately 26 minutes. Once inside, the Johnsons joined a group of rioters in rushing and shoving aside several U.S. Capitol Police officers who were guarding the East Rotunda doors from a mass of additional rioters gathered outside. The Johnsons, along with a group of other rioters, pushed against the line of police officers, sandwiching them against the doors, and forced open the East Rotunda doors. When the doors opened, they were at the front of the group.

Government's Sentencing Memorandum, *United States v. Daryl Johnson,* No. 21-cr-407-DLF (D.D.C. May 25, 2022) [ECF No. 57] at 1-2. According to the government, these acts "allowed additional rioters to stream into the building, thus further jeopardizing the lawful occupants of the Capitol and supporting the efforts of the mob to obstruct the certification vote." *Id.* at 2.

On January 7, 2021, the father posted, "Mark my words Yesterday will be the beginning of the revolution . . . . what happens when those same people decide to throw out the 'elected officials.' It will be hangings on the front lawn of the capital – that crowd is not messing around." *Id.* A week later he sent a private message on Facebook stating, "It's going to get very ugly and probably result in some version of a civil war." *Id.* And a month after the riot, he posted, "Bring it on Biden! I have no problem dying in a pool of empty shell casing." *Id.*

The day before the riot, the son posted, "Fuck Biden." Government's Sentencing Memorandum, *United States v. Daniel Johnson,* No. 21-cr-407-DLF (D.D.C. May 25, 2022) [ECF No. 58] at 2. After leaving the Capitol on January 6, 2021, he sent a message to a third party saying, "I was one of the first ones inside," and "[w]as fucking wild." When the third party responded, "I bet should have shit on nancys [*sic*] desk." *Id.* The son replied, "Dude I'm sure her office got trashed. I was trying to find a way into the chamber." *Id.*

11

In that case, the government recommended sentences of three months' incarceration for the Father, and six months for the son.  Government's Sentencing Memorandum, *United States v. Daryl Johnson,* No. 21-cr-407-DLF (D.D.C. May 25, 2022) [ECF No. 57] at 1; Government's Sentencing Memorandum, *United States v. Daniel Johnson,* No. 21-cr-407-DLF (D.D.C. May 25, 2022) [ECF No. 58] at 1.  The Court sentenced the father to 30 days' incarceration, and the son to four months.  Judgment*, United States v. Daryl Johnson,* No. 21-cr-407-DLF (D.D.C. June 2, 2022) [ECF No. 72] at 2; Judgment*, United States v. Daniel Johnson,* No. 21-cr-407-DLF (D.D.C. June 2, 2022) [ECF No. 70] at 2.

Luke's conduct on January 6, 2021, pales in comparison to that of Mr. Griswold or the Johnsons,' and the sentences in those cases should be seen as an upper limit on any sentence of incarceration imposed on him.  The 10-month term of incarceration the government seeks would place Luke in the top third of sentences imposed in § 231(a)(3) cases to date, a position unwarranted by his actions on January 6, 2021.

2. **A Sentence of Probation Would Afford Adequate Deterrence to Criminal Conduct, and Would Protect the Public.**

It is difficult to imagine the unique circumstances of January 6, 2021, occurring again, and it is equally difficult to imagine Luke Lints being involved in any future criminal conduct. Luke has no criminal history, and as discussed above, those who know him best say they have "never seen him act or speak in an aggressive way towards another person," Exh. A, have "never seen him angry or have known him to be in trouble in any way." Exh. B.  They describe him as "good, caring, and gentle," Exh. A, "even keeled," Exh. Bo, a "caring person," Exh. C, "always looking for ways to help and people to love," Exh. D, "very compassionate," Exh. E, someone who "has a good heart, [and] cares," Exh. F, and  "as gentle a soul as anyone makes them." Exh. G.

Luke did not come to Washington on January 6, 2021, to engage in any unrest, or to interfere with any government processes. Instead, his actions that day are in keeping with the description of his friend Mitchell Lewis, who says, "the only way I have ever seen [Luke] act aggressively is in the protection of people who couldn't help themselves." Exh. G. Nevertheless, Luke has learned a valuable – and costly – lesson, accepting responsibility and a felony conviction for his actions that day. There is no need for incarceration to reinforce that lesson.

### 3. A Sentence of Probation – With a Significant Community Service Component – Would Provide Luke Lints with Correctional Treatment in the Most Effective Manner.

Luke recognizes that despite his best intentions, his conduct on January 6, 2021, contributed to the chaos and disorder that occurred that day, and to the damage those events did to our democracy. He accepts responsibility for his actions, and recognizes the need for punishment. However, he respectfully suggests that a probationary sentence with a significant community service component is appropriate in his case. Given Luke's character, and the circumstances surrounding his actions on January 6, 2021, incarcerating him would provide little, if any, benefit to him or to the community as a whole, while community service would allow him to atone for his actions by making a positive contribution to society.

### CONCLUSION

For all the foregoing reasons, Luke Lints respectfully submits that a term of probation, with a significant community service component, is the appropriate sentence in this case.

Dated: May 19, 2023                             Respectfully submitted,

 /s/ Paul F. Enzinna
D.C. Bar No. 421819
Ellerman Enzinna Levy PLLC
1050 30th Street, NW
Washington, DC 20007
202.753.5553
penzinna@eellaw.com

*Counsel for Defendant Luke Lints*

### CERTIFICATE OF SERVICE

I certify that on May 19, 2023, a copy of the foregoing Defendant's Memorandum in Aid of Sentencing was filed using the CM/ECF system, which will then send notification of such filing to all counsel of record.

Dated:   May 19, 2023                             Respectfully submitted,

 /s/ Paul F. Enzinna
Ellerman Enzinna Levy PLLC
1050 30th Street, NW
Washington, DC 20007
202.753.5553
penzinna@eellaw.com

*Counsel for Defendant Luke Lints*